## KIMBALL vs. JOHNSON and others.

The acknowledgment of a mortgage made to a married woman, is not invalid because taken before the husband of the mortgagee, who was a justice of the peace in this state.

The judgment in this case (which was an action to foreclose a mortgage) was reversed on the ground that the finding of facts by the circuit court was not supported by the weight of evidence.

APPEAL from the Circuit Court for *Kenosha* County.

This was an action to foreclose a mortgage given by the defendant *Isaiah Johnson* and wife to Betsy D. Goff, dated March 10th, 1856, to secure the note of said *Isaiah*, of that date, for $600, payable to her order one year after date, and alleged in the complaint to have been indorsed to the plaintiff before it fell due. The acknowledgment of the mortgage purported to have been made before William Goff, who was the husband of said Betsy, and was a justice of the peace. The mortgage was recorded April 15, 1856. The mortgagors and *Campbell*, a subsequent mortgagee, resisted the foreclosure, on the grounds, among others, that the mortgage in suit was never acknowledged as required by law, and that the note referred to in the mortgage was obtained without any consideration, and was assigned to the plaintiff (if assigned at all) for the purpose of cutting off their defense.

On the trial, it appeared that at the date of the mortgage, and for some time previous, William Goff and *Isaiah Johnson* had been members of a partnership, engaged in the lumber business, the former spending his time principally at Keno-

sha, and the latter at Manitowoc.  Mr. Goff testified, that in
January, 1856, he told *Johnson* there was an indebtedness of
the firm which must be met, and that *Johnson* said he was
willing to get money to meet it if he knew where it could
be had, and that if the witness's wife had money, he was wil-
ling to give a mortgage to secure the loan of $600 for that
purpose ; that the consideration of the note above mention-
ed was $600, of money belonging to his wife, which, at *John-
son's* request, he had got from her and had used in paying
certain debts of the firm; that about the 15th of March,
1856, he inclosed the note and mortgage in a letter to *John-
son*, at Manitowoc, requesting him to execute and return
them ; that he thought *Johnson* did not then sign either of
them, but that he came to Kenosha, and on the 3d of April,
1856, handed witness the note and executed the mortgage ;
that at the time of executing the mortgage, *Johnson* knew
that the money had been used in paying the firm debts, and
said it was all right.  The witness produced the notes of the
firm, which he referred to as having been taken up, in part,
with the $600 of his wife's money, being a note for $950,
due the Kenosha County Bank, one for $54, due to Sim-
mons & Co., and one for $367.25, to parties in Chicago.—
Being called on to state when he received the $600 from his
wife, he stated that there was an ante-nuptial contract be-
tween himself and his wife (which was produced, bearing
date April 5, 1845), by which it was agreed that her estate,
and any which she might acquire by descent or otherwise
should be secured to her separate use, and by which the
property she then owned was conveyed to a trustee for her
sole benefit; that her estate at that time consisted of $1200
or $1500 in notes, and some $200 or $300 or more in money,
and real estate prospectively ; that when they came to Wis-
consin in 1848, she brought $600 or $800 in money with
her, and had since received $950 from the sale of real estate
inherited from her mother ; that he had received money from
her at various times and had invested money which she had
inherited, and acted as her agent in loaning the same ; that
he had never had any settlement with the trustee of his
wife, but had informed him how the money was used ; that

in January, 1856, he collected of his wife's money $600, which he deposited in the Kenosha County Bank, at the same time with other funds amounting in all to $1031.90; that he deposited the money to his own credit, but made a minute at the time, that $600 was his wife's money, and so stated to the cashier or teller; that he took up the note of $950, held by the Kenosha County Bank, by his check on that bank, dated January 29th, 1856, and paid the debt due in Chicago about the time he sent the note and mortgage to *Johnson* to be executed; that the $600 was credited to *Johnson* on the partnership books, which had been for some time in the hands of *Johnson*, and that he (the witness) had paid for the firm since its commencement, $3119.84, (in which were included the notes before mentioned for $950, and $54, and for machinery at Chicago $500), and what he had received "out of company papers of said sums, was $600 and $432." Being asked if he did not state in the letter to *Johnson*, enclosing the note and mortgage, that his wife had $600 in the Kenosha County Bank which *Johnson* could have on the return of the papers, executed, and if he did not state to one Reuben Palmer, after writing that letter, that his wife had $600 in the bank which was ready for *Johnson* as soon as the papers sent to him were returned, he answered that he had no reccollection of making such statement in that letter, or in any conversation with Palmer.— The defendant *Johnson* testified that between the 14th and 20th of March, 1856, he received a letter from Mr. Goff, enclosing the note in suit, and stating that his (Goff's) wife had $600 in the Kenosha County Bank, which he (*Johnson*) could have if he would sign and return the note; that he put the letter into a chest which was unlocked, and had not, after diligent search, been able to find it; that upon that statement in the letter, he signed the note and returned it; that after he went back to Kenosha, on the 3d of April, Goff told him the money was his wife's, and was in the Kenosha County Bank; that he called on the teller of the bank for it in the latter part of April, and was informed that there was no money there for him; that again in May he saw the plaintiff in this suit (who was cashier of the

bank), and was told there was no money there for him, and in the forepart of July he again inquired of the plaintiff if there was any money deposited in the bank for him by Mrs. Goff, or if she or Goff had any there in March or April, and was answered in the negative; that he then told the plaintiff that Goff had written to him that his wife had $600 in that bank, which he could have if he would execute a note and mortgage, but that he had not had one cent of it; that he talked with the plaintiff about it several times, before he bought the mortgage, and told him the date of the mortgage, and what property it was upon; that he sold out all his interest in the partnership in August, 1856, and in November demanded the note and mortgage from Goff and his wife; that Goff promised, from time to time, to give it up; and that Goff had told him that the $950 note was taken up by giving a new note to the bank, in the firm name. The witness produced the partnership books, in which appeared an entry of the $600 credited to *Johnson*, for money received of Mrs. Goff in 1856. An erasure appeared to have been made in the book, and the witness stated "that he made the erasure because he thought it ought not to have been there. It was for money he had paid, not for the company, as it was entered, but in fact was paid out on a private account for land." He stated also that he had paid into the capital stock of the firm between $2,000 and $3,000, all of which, he said, was entered in the partnership book, and a part of it consisted of cooking utensils, &c. On cross-examination, he testified that part of the entries of what he had paid in (being for household furniture, cooking utensils, &c., to the amount of several hundred dollars) were made by him after he took possession of the partnership books, and after he and Goff had tried to settle, and that he did not remember of having read the letter Goff sent him, more than once.

S. Johnson, a son of *Isaiah*, testified that in the spring of 1856, he took from the post office at Manitowoc, a letter from Goff to his father, and read it; that it contained a note for $600, but no mortgage, and it read as follows: "*Mr. Isaiah Johnson*, Sir: I have got back to Kenosha. My wife

has $600 in the Kenosha County Bank; if you will sign this note and return it, you can have the money. * * * You sign this note and return it and you can have the money, $600, that my wife has in the bank. I have seen Mrs. Johnson, and told her all about it;" that his father read the letter and signed the note; and that the note in suit (which the witness had just read) was the one contained in the letter. On cross-examination he stated that he had never read the letter but once, and that his attention was not called to its contents until the next fall afterwards, and on being required to repeat the words of the note he had just read he declined attempting it. The defendant also read the deposition of Reuben Palmer, (his brother-in-law), which stated that in March, 1856, the deponent had a conversation with Goff, in which the latter said that he had sent some papers to *Mr. Johnson*, and that his wife had $600 in the bank which was ready for him as soon as the papers were returned; and read also the deposition of R. B. Palmer, (a son of the last witness), who testified that he was present at the conversation referred to by his father; that his father told Mr. Goff that *Mr. Johnson* requested him to see whether Goff had found out where they could get some money; that Goff replied that he had made out the papers and sent them to *Johnson*, and that his wife had the money in the bank; that his father told Goff there was another person of whom he or they could get it, and Goff answered that they could have it of his wife if they wanted it, but if they had rather get it anywhere else, it would make no difference; that as soon as *Johnson* signed the papers and sent them back, the money was ready for him in the bank. Lane, a witness for the defendant, testified that he was present in the spring of 1857, when Goff and *Johnson* were trying to settle their partnership affairs, and that he understood Goff to say at that time, that he paid the $950 note by his check, and gave the company's note to the Kenosha County Bank to pay the check with. Mr. Goff recalled, stated that he never knew that *Johnson* wanted money for his private business in the spring of 1856; that he had no recollection of *Johnson's* speaking to him again about the note and mortgage, until the latter

part of the summer or in the fall, nor until after he (*John- <span>June Term, 1861.</span>
son*) had sold out, and left the company's debts unprovided
for; and that he had no recollection of ever having promis-   KIMBALL
                                                                    v.
ed *Johnson* to give up to him the note and mortgage.   The JOHNSON et al.
plaintiff testified that he was cashier of the Kenosha Coun-
ty Bank; that the note of $950 was paid by Mr. Goff's
check on that bank, Jan. 29, 1856, and the deposit out of
which it was paid, was not in virtue of any note made by
Johnson, Goff & Co., and it was a month or more after it was
paid before any new note was discounted for that firm,
by the bank.   He testified also, that the other notes for $54,
and $364.14 referred to by Goff in his examination, were paid
by Mr. Goff, the first, January 29th, and the last, March 12th,
1856.   He also stated that Johnson, Goff & Co. kept no ac-
count at the bank; and produced a copy of the bank account
of Goff for the month of January, 1856, which showed that
on the 28th of that month, Goff had less than $10.00 to his
credit, and on the 29th made a deposit, which was entered
as follows: "($600 Mrs. G's), $1031.90," and on the same
day checked for $1004.00.   He also stated that Johnson,
Gcff & Co. were still indebted to the Kenosha County Bank
about $2,000, and that he held the note and mortgage in
suit as a collateral security for that debt, having paid Mrs.
Goff nothing for it, and that he had no recollection of *John-
son's* having ever said anything about them until after they
were assigned to him.

The circuit court found that the note and mortgage were
given without consideration, and that the plaintiff had no
cause of action.   Judgment for the defendants.

*By the Court,* DIXON, C. J.   The questions involved in December 30
this case are principally of fact, and upon them we are una-
ble to concur with the circuit judge.   The testimony of the
witness William Goff, if he is to be believed, fully sustains
the plaintiff's right to recover.   We believe him.   He testi-
fies with fairness and candor, and with no attempt at preva-
rication or concealment.   His history of the transaction is
rational and consistent, and bears throughout inherent evi-
dence of its truthfulness.   It is corroborated in the most

June Term,
1861.

KIMBALL
v.
JOHNSON et al.

material points by other proof, and particularly by the documentary evidence, which is more certain and reliable in its character than the oral evidence of the witnesses. Even the books of the partnership, when seen through the mutilations and changes of the defendant *Johnson,* show that the money was borrowed by him and used for the benefit of the firm of Johnson & Goff. The separate property of Mrs. Goff, the ante-nuptial contract and appointment of the trustee, and Goff's agency in the management of her property, are established beyond any reasonable doubt. The deposit book of Mr. Goff in the hand writing of the teller of the bank, and the entries in the books of the bank show, in a manner which precludes all debate, that there was $600 deposited in the bank, and set apart as the money of Mrs. Goff. It is impossible to suppose that these books were prepared at the time, with a view to any anticipated effect which they might have upon this litigation. The same books show with equal clearness and certainty, that the $600 went towards the payment of the $950 bank note, and the $54 note to Simmons & Son. The pretense that Goff paid the check with the note of the company, or that he obtained the money by giving such a note, is entirely unsupported by the evidence.— When we consider the nature and amount of their business, and that *Johnson* was familiar with it and in possession of the books, it is incredible that Goff should have realized such a sum upon the note of the firm, and yet that *Johnson* should be unable to search out and establish the fact. No *bona fide* effort was made to prove it, and we do not believe that the claim was put forth from an honest conviction that such was the case. It is true that some questions are put to Goff upon that hypothesis, but we cannot regard them as having been asked in good faith. If they were, his answers completely negative the assumption, and explain the subsequent transactions with the bank as fully as could be expected under the circumstances. In this, as in most other respects, he is supported by the plaintiff *Kimball,* who testifies positively that no money was borrowed from the bank at that time, nor for a considerable time afterwards. If the money was borrowed elsewhere, it could not have been a

secret which was past finding out. The notes taken up were produced with the marks of cancellation upon them, and we think it was conclusively shown that $600 of Mrs. Goff's money was appropriated in the manner stated by Mr. Goff.

The next question is, whether it was thus appropriated with the knowledge and consent of the defendant *Johnson,* and as so much money contributed by him towards discharging the indebtedness of the firm, with the understanding that he was to execute the note and mortgage to secure its repayment to Mrs. Goff. We have no doubt that it was. If there were no other evidence before us but the note and the fact that the $600 was so applied, the testimony of the defendant *Johnson* alone would convince us that they were executed and delivered to secure the payment of it. He claims that he needed the money in his own private business, and that he executed and delivered the note and mortgage with the expectation that it would be advanced to him for that purpose, which was never done. His relation of the affair is altogether too strange and unaccountable for us to credit. The note and mortgage are dated March 10, 1856. It would appear from this testimony that the negotiation was opened by Goff's sending the note to him at Manitowoc sometime about the 15th of that month to be executed and returned, saying that Mrs. Goff had the money in the bank, which he could have if he would sign it. Without further examination or inquiry, he signed the note and returned it in a letter. After his return to Kenosha, and on the 3d of April, the mortgage was presented, and he and his wife signed it. At that time also he says Goff told him the money was in the bank. Now the most remarkable feature of his testimony is, if, as he says, he borrowed the money for his individual purposes, that he should not have called for and received it before executing and delivering the note and mortgage. It may not be surprising that he should have signed and returned the note, but it is certainly very extraordinary that he should have executed and delivered the mortgage without demanding the money. Yet if he is to be believed, he did not even ask for it, but contented him-

self with Goff's statement that it was in the bank. Nearly a month had already elapsed since the date of the note, and still he says he made no inquiries for the money until about a month after the acknowledgment and delivery of the mortgage, and then instead of going to Mrs. Goff or her husband, he called first in the latter part of April, upon the teller of the bank, and subsequently, in May, upon Mr. *Kimball*, the cashier; and it would appear from the testimony of the witness Palmer, that he called again upon Mr. *Kimball* in the fore part of June. He was distinctly informed on each of these occasions, that Mrs. Goff had deposited no money there for him, and yet he did not notify her or make any complaint until the November following, when he demanded a return of the note and mortgage. It appears that at that time there had been a quarrel between him and Goff, and the copartnership had been dissolved. A man who was under the necessity of borrowing money at a high rate of interest, and who had delivered his securities with the expectation of receiving it, would not have conducted himself in this way. He would have resisted the outrage by prompt and active measures. A statement so inconsistent and irrational cannot be believed. The defendant's behavior, according to his own account of it, is subject to no reasonable explanation except upon the supposition that Goff speaks the truth. Hence he strengthens rather than weakens Goff's testimony. Again, if the money had been intended for his individual use, he could have explained the purpose for which it was required. He is entirely silent upon that subject.

The evidence of the witnesses Reuben Palmer, Reuben B. Palmer, Shepard Johnson and Lane, does not affect the case. Its leading features are too strongly marked by facts and circumstances about which there could be no dispute, to be overcome and shaken by such testimony. Of such admissions it has been well remarked, that they are "a species of evidence easy to manufacture, difficult to rebut, often issuing through interested channels, and in the most favorable aspect, reflected from the memory or inferences of the witnesses." With the exception of Lane, who speaks with great

doubt and caution, the admissions testified to cannot be said to come through disinterested channels. The witnesses are the relatives of the defendant *Johnson*, and the testimony of his son Shepard Johnson is such on its face as would stagger the belief of any intelligent unprejudiced mind. His statement of the contents of the letter seems, under the circumstances, quite beyond reason and truth.

The only question of law presented is as to the validity of the acknowledgment of the mortgage. It was acknowleged before Mr. Goff, the husband of the mortgagee. We do not think he was on that account disqualified from taking it.

Upon the whole, therefore, we are of opinion that the judgment of the circuit court must be reversed, and the cause remanded with direction that judgment be entered for the plaintiff according to the demand of his complaint.

Ordered accordingly.